The last case on the calendar is ICP Strategic Credit Income Fund et al. v. D.L.A. Piper, L.P., U.S. Good afternoon, Your Honor. Josh Brokaw for plaintiffs and appellants here, which I'll refer to simply as the funds. This is an appeal from a motion to dismiss. As the funds allege in their complaint, their director and manager misappropriated more than $36 million from them to pay the obligations of another entity, Tri-X Funding. Defendant D.L.A. Piper assisted in that misappropriation and aided in its concealment from the fund's stakeholders by documenting these transfers as a sham loan agreement to Barclays Bank. Now, this appeal primarily concerns two issues. First, in dismissing the fund's fraudulent trading claim under Cayman Law, the District Court errant holding that the sham loan agreement was not necessarily fraudulent simply because there was some theoretical prospect of repayment. Second, in applying the defense of imprudent electo to the fund's aiding and abetting claims, did the District Court errant holding that New York had a superior interest to that in the Cayman Islands in determining whether the funds are responsible for the breaches of fiduciary duty of one of their directors. So I'd like to first turn to the fraudulent trading claim, which is not subject to any imprudent electo defense. In dismissing that claim, the District Court misinterpreted the law. The District Court believed that the funds had to show that there was no prospect of repayment to plead the claim. But the law on fraudulent trading does not set such a stringent test for liability. Rather, set forth in the case law, and as summarized by the fund's foreign law expert, it is fraud if there is proven that there is a dishonest taking of a risk that there was no right to take that would cause harm or prejudice to a company's creditors. That is exactly what is alleged here. There was, at the very least, a substantial risk of the fund's creditors, the redeeming investors, not being paid because ICP and Priori, the manager and the director, decided to literally gamble away the fund's cash with no right to repayment. The DLA, for its part, unquestionably had knowledge of these fraudulent purposes. The best evidence of DLA's knowing participation in a fraud was its role in documenting fake margin calls so that TriEx Funding could make interest payments to its note holders and pay other expenses. In fact, DLA even went so far as to document a completely fake margin call so that it could take money from the master fund and get paid its own outstanding legal bills to TriEx Funding, a separate entity. Now, to do so, DLA directed that cash first to Barclays, and then Barclays transferred that cash to TriEx Funding's trustee to create the false appearance that Barclays, as the holder of the collateral, was making contractual payments to TriEx Funding. So DLA's willingness to facilitate, utterly without question, these fake margin calls, and, for lack of a better term, to launder that cash taken from the master fund to get paid its own outstanding legal bills to a different entity, shows DLA's knowledge of the fraudulent nature of the entire series of transfers here. And the fact that DLA created this fiction of a loan to Barclays shows that DLA knew that the transfers had fraudulent purposes. As the U.K. court held in Bank of India, it, quote, must have been obvious to the defendant that the transaction was not an ordinary loan transaction of any kind. These transfers were far from ordinary. Barclays even recognized the fraudulent nature of the transfers and reserved its rights in case it got sued in a fraudulent transfer case. Moreover, it's not ordinary for a law firm to draft documents for a non-client with no regards for whether or not that client should make the representations or whether or not the client should even enter into the transaction. If the transfers were legitimate, as DLA contends, there just would have been no reason to misrepresent their actual nature, much less for DLA, in its deposition before the SEC, to mislead the SEC about how the repayment, the alleged repayment mechanism, was actually going to work. In sum, on this issue, the Cayman Court, albeit on an ex parte basis, sanctioned the pursuit of the fraudulent trading claims here, finding that the liquidators do have a cause of action under Section 147. The funds respect the request of this Court find the same. Turning to the imperial delicto defense and the conflict of laws issue, the District Court applied New York law to the question of imputation because it did not conduct a proper conflict of laws analysis. The District Court did not, as mandated by a line of New York cases from the New York Court of Appeals, isolate the relevant issue. Here, that relevant issue is imputation. And the fact that the imputation issue must be separately evaluated as part of a conflict of laws analysis is confirmed by the First Department's opinion in FAI Leveraged Fund. Critically, that is the only New York case to consider the argument that the imputation issue must, in accordance with Babcock and its progeny, be subject to a separate conflict of laws analysis. The cases relied upon by the District Court and DLA, including New Greenwich, are simply an opposite because those courts were never even asked to consider an issue-by-issue application of all the potential conflicting laws here. Now, I acknowledge that the FAI Court did hold that New York had a paramount interest in that case in deciding the imputation issue. But that case did not involve an aiding and abetting claim. And more importantly, the agent there was neither a director nor officer of the company. There is an important distinction between a third-party investment manager and a corporate director when considering the agency relationship. Just as the New York Court of Appeals has advised, the relevant facts are those that relate to the purposes of the particular law in conflict. So what are the relevant facts in determining what jurisdiction has the greatest interest in governing the agency relationship between a corporation and the directors of that corporation? The most relevant fact is where the company is incorporated. This is because, as the First Department held in heart, the corporation and its shareholders rightfully expect that the laws under which they have chosen to do business will be applied. And it's for this exact same reason, when we look at the underlying breach of fiduciary duty claim, that courts... You believe that? Excuse me? You believe that... You actually believe that those who organize a corporation in a particular locale do so on the basis that the law of that jurisdiction is the law that's going to apply to their economic transactions around the world? Your Honor, I believe that the law that they choose is going to govern the relationship between them and their directors. So if they have a board of directors, just as we look to Delaware, just as courts have continually recognized that Delaware has a unique interest in deciding the relationship between a Delaware director and a Delaware corporation, irrespective of where that business could be conducted, we're going to look to Delaware law to inform what was this fiduciary standard, was there a breach of fiduciary duty, and as we contend here, if you're going to look at it to inform those first two questions, you should also look at it to inform the question of whether or not the Delaware incorporated entity is responsible for the conduct of one of its directors. Here, we just so happen to have a Cayman Islands incorporated company as opposed to a Delaware incorporated... Is that not an issue of imputation, the way you described it? Yes, it is an issue of imputation. That's an agency issue? It is an agency issue. And you refer to FIA leverage, and so when we look at the most significant relationship, which is what FIA leverage tells us to do, how can it not be New York? The most significant relationship to this agency question is the state of incorporation, because just because one of the directors was in New York, the other directors were in the Cayman Islands. Imputation. Because the imputation question is whether or not the company is responsible for the conduct of its agent. So what law am I going to determine whether or not to hold a company responsible for its agent's acts? Now, if that agent is a third party, maybe a different law will apply. When that agent is one of your directors or your board of directors, the law that has the jurisdiction as the paramount interest in deciding that question should be the state of incorporation because it also governs the underlying fiduciary relationship. Thank you. Thank you. Thank you, Your Honors. Kevin Rosen from Gibson Dun & Crutcher on behalf of the appellee DLA Piper. Since New York's imperative delicto doctrine is dispositive here as to the aiding and abetting claim, I'll focus my remarks on that subject first, and in particular in response to some of the comments that were made in the reply brief as well as during oral argument. And then I'll briefly touch on the Cayman Islands claim and the sufficiency of the allegations regarding actual knowledge of breach of fiduciary duty. The hedge funds here obviously want to apply Cayman law with respect to one component, imputation of the entire imperative delicto defense, to what is undisputably a New York claim for aiding and abetting. Why? Because effectively, if you read their briefs, you'll see that they concede that affirmance on imperative delicto grounds is really required under New York law. Now, in one sense, this entire discussion about imputation and the choice of law analysis is a bit academic. And why do I say that? Because if you look carefully at their briefing and you listen carefully to the argument, their argument, putting aside the fact that they're wrong with respect to imputation, and I'll come back to that, but their entire argument about imputation is focused on Mr. Priori, the director. And they completely ignore the fact that we have five other actors here whose conduct imputation is attributable to the hedge funds. ICP, which is not a Cayman Islands director, and its actions were in New York, and four other senior officers of ICP, specifically identified in paragraphs 35 to 38 of the complaint, who are alleged in the complaint to have been fully involved in the fraud that forms the foundation of the allegations in the complaint. So putting aside Priori for a second and whether his conduct is imputable to the hedge funds here, you have undisputed imputation by ICP itself, and remember that ICP is identified in the very first paragraph of the complaint, paragraph one, as the investment manager. Moreover, the complaint over and over again, if you look at the complaint, every action, every alleged instance of misconduct, you see the phrase ICP and Priori. So the complaint makes clear that the allegations of misconduct are attributable to ICP. ICP is not a director. So this entire line of argument with respect to misconduct imputed to the hedge funds about Priori has nothing to do with the other four or five relevant actors here, and in that sense it's academic. But even with respect to Mr. Priori himself and the argument about the internal affairs doctrine, the fact of the matter is, and, Your Honor, you quite rightfully focused on FIA leveraged, and significantly in FIA leveraged, counsel here made precisely the same argument that we're hearing now to the appellate division in that case, and the appellate division disagreed in that motion to dismiss context. The court specifically rejected the application of the in peri delicto, to the internal affairs doctrine to imputation regarding conduct by investment managers, the same type of investment managers we have here. The court also held that New York law required imputation after conducting an interest analysis, which is what Judge Broderick did in the alternative in his order, and that is consistent, of course, with the New York Court of Appeals decision in Kirshner about very expressly stating, and in the words of the New York Court of Appeals, a strong public policy considerations for applying New York law to imputation, including the adverse interest exception to imputation, and stating that the most significant relationship to defenses to claims, and this is the New York Court of Appeals talking, including imputation is the jurisdiction whose law governs the claim itself, and in that case it was the aiding and abetting claim as well. The court also held that the jurisdiction with the greatest interest in the litigation and the underlying claims also has, in the underlying claim here, is aiding and abetting fraud under New York law, has an acute interest in the availability of defenses to that claim, and how those defenses are interpreted. And, of course, we have here, what do we have with respect to New York? We have a New York cause of action brought in a New York court alleging conduct that occurred exclusively in New York by New York lawyers and New York investment managers. The only connection whatsoever in this case is the fact that the hedge funds happened to have been incorporated in New York, in the Cayman Islands, excuse me. The other important case, aside from the FIA case that you mentioned, Your Honor, is the New Greenwich case. And the New Greenwich case, I think, is interesting to look at for purposes of this analysis, aside from the fact, of course, that it rejected the application of the internal affairs doctrine there as well, which the funds conceded, footnote 97 of their brief, and the fact that it also reiterates, as Your Honor said, that imputation is an issue of agency and not subject to the internal affairs doctrine. But New Greenwich offers a formulation that I think is helpful in sort of getting your arms around this whole issue in a very simple way. The formulation offered by that court is that the internal affairs doctrine does not apply to the rights of third parties external to the corporation. Outside administrators and auditors, in that case, PWC, contractual agents are third parties external to the funds. And significantly, in that case, the court noted, even though the auditor, who was the defendant in that case, PWC, that their role as an auditor relates to the internal affairs of the corporation. That's the language that the New Greenwich court . . . Corporate governance. Exactly. Exactly. This is not a claim by the investors that he's talking about against their fiduciaries. That's a different lawsuit in a different place involving different issues and different policies and not involving the issue of imputation. It's a direct claim. So the key takeaways, of course, is that New York has a very strong interest in how imperi delicto is applied, how imputation is interpreted, how the adverse exception is applied, and thus in a choice of law analysis, New York very clearly does not want the internal affairs doctrine to supplement New York agency law. It's simply not applicable to imputation. So, having settled that issue with respect to imputation, we now move on to does the . . . with respect to choice of law, I think all you have to do is look at Kirshner to dispose of the argument that the adverse interest exception does not apply. Why? Kirshner tells us everything I think we need to know, even though there's other cases that we cited in our brief that stand for the same proposition. Why? Kirshner says you only need some benefit, quote, to any extent. Benefit to the entity. Again, this is all in the words of the New York Court of Appeals. It's immaterial that it's turned out that it would have been better for the agent to have acted differently, as the hedge funds have argued here. Significant, even short-term, illusory benefits with long-term harm don't qualify. All corporate acts, including, and they gave a specific example, moving assets between corporate entities, are subject to the presumption of imputation. The adverse interest exception represents, in their words, strong public policy that should not be weakened by exception. The adverse interest exception is one of the, again their words, most narrow of exceptions, even in difficult cases, and it applies irrespective of motive. In their words, even if motivated by the agent's desire for personal gain. And from the standpoint of benefit under that standard, with those policies from New York's highest court, we know, as both Judge Broderick and Judge Gerber found, that there was a perfectly reasonable and certainly beneficial aspect to the situation where the funds were going to cover the margin call. Why? Because as they acknowledge in the complaint itself, paragraphs 3, 7, 18, and 48, the funds had a 50% stake in $245 million worth of CDOs. As the complaint acknowledges, Triax had no other option in order to meet the margin call, and Barclays would have foreclosed. We know that from paragraphs 40, 43, 31, and 33 of the complaint. And we specifically know from paragraph 42 of the complaint that Triax had no other means to raise capital. We also have, in addition to protecting their 50% interest in those $245 million, Judge Broderick, in his opinion, identified two other benefits that I won't repeat here. So that's my point with respect to impera delicta regarding the aiding and abetting claim. With respect to the Cayman Islands fraudulent trading claim, I'll state very simply, the statute itself requires knowledge, knowledge means knowledge, that the business was carried on, and carried on means something specific, with an intent to defraud or fraudulent purpose. Now, if you read the briefing from the appellant here, fundamentally what they're trying to do is they're trying to pick and choose little bits of statements from different cases to try to suggest that fraud means something than fraud, knowledge means something than knowledge, and carried on is so broad that it's a meaningless provision within the statute. We know, even from the hedge funds expert, for example, that the two-page declaration that they submitted on the question of fraud, fraud is very similar to what we understand as fraud. The description from that expert talks about no prospect of repayment, payment that will never be settled, and no good reason to believe that repayment will happen. And I would submit, Your Honors, in this case, frankly, we're asking the wrong question if we focus exclusively on repayment, because it's not an unreasonable judgment to make that certainly with respect to the initial investments, and then further, in terms of meeting the margin call so you don't lose roughly $123 million worth of your investments, that you might be willing to do that even if the prospect for repayment is limited, perhaps non-existent, and it is not an unreasonable business judgment, and remember, we're talking about lawyers here, not business advisors, not accountants, with respect to that issue. On the issue of knowledge, aside from the pleading standard of Rule 8 and 9B, the case law, Bank of India, that was quoted, talks about a deliberate decision to avoid obtaining confirmation, and an actual appreciation that the answer is likely to disclose the existence of fraud. That is significant language. That's just not anything and everything. And carrying on means some, it has to have some sort of direct relationship to have any meaning at all. With respect to the actual knowledge, because I think it ties into some of what has been said and the characterization of my client that's been made very, very briefly, I'd like to point out just the following. Good lawyers are often asked to solve tough problems. That's why they get called. And we know this was a tough problem. The client, the investment manager, not the hedge funds, the investment manager was faced with a $122.5 guaranteed, because the margin call couldn't, as we know from the complaint, could not be met, guaranteed loss of $122.5 million, and an indenture agreement that Triax had that limited the options in terms of direct loans to Triax, with Triax having no other options to obtain additional capital, as I said in paragraph 42. Is this your defense of the lawyer? Yes, Your Honor. Okay. I want you to end. I'm sorry?  I will. Thank you, Your Honor. Mr. Brucker, I'll have you reserve three minutes. I want to start by addressing what I think are the absurd results that can occur if you do not apply a single state's law to the imputation question. And one of the best cases that illustrates that is the Cobalt case, which we do cite in our brief, in which the court looked at, you had three defendants there. Do you really distinguish Kirchner? With respect to Kirchner, the court there in Kirchner held that there was a distinction between fraud that's committed against the company and fraud that's committed on behalf of the company. You agreed with me when you first got up at the podium that really we're talking about imputation, correct? That's correct, Your Honor. And Kirchner makes it pretty clear that, at least as a matter of New York law, the Court of Appeals views imputation matters as a matter of New York policy, have a very close connection to New York. Is that right? There was no conflict of law argument in the Kirchner case. I understand that. And so what they assumed is that the agency relationship was governed by New York law. So I don't know if what the paramount policy interest that was applying there was already based upon the assumption that New York applied to that underlying agency question. But with respect to Kirchner, almost every case that has applied Kirchner has been a circumstance in which the fraud was first felt by a separate party. So the fraud was committed by the hedge fund on investors to bring money into the hedge fund, and then the money was looted. Here we do not have that circumstance. There was no other party that was to fraud it. The only party that was to fraud it was the master fund. And they make a lot of the fact that the master fund was a creditor in another entity that received part of the benefits of the transfer. But just because it was a mezzanine note holder with different tranches of notes is not a sufficient basis on the pleading standard to presume imputation because that requires a complex analysis of, okay, I'm not ever going to get my $36 million back. What's the value of my current investment in Tri-X funding? What's the hope of it ever coming back? What's the likelihood of the market crashing? That's a complex analysis that just can't be assumed that because I'm a creditor in an entity that received the money that I received a benefit under the Kirchner standard. And just quickly back to the defraudulent trading claim, what is still continually to be missed by the defendants here is the fact that, in addition to the margin payments, there was over a million dollars, around a million dollars that was taken from one note holder, the master fund here, to basically make sure that other note holders got paid out of Tri-X funding. DLA continues to kind of ignore that allegation and also ignore the allegation that it took the master fund's own cash to get paid its outstanding legal bills to another entity, and in doing so concealed how those transfers occurred and then lied about them and called those transfers to Barclays Bank and assisted then the ICP and Priori in documenting those transfers as a loan on its books so that they don't have to reveal what's actually happened. Thanks very much. We'll reserve decision, and we are adjourned.